```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
VITALI MOURZAKHANOV,
                                    AFFIDAVIT OF JOHN E. DURST
                    Plaintiff,  IN OPPOSITION TO MOTION

        -against-                   07 CV 6205 (LAK)

DEWALT INDUSTRIAL TOOL CO.,
DEWALT  CONSTRUCTION TOOLS and
BLACK AND DECKER (U.S.) INC

                    Defendants.
-------------------------------X

STATE OF NEW YORK   )
                    ) ss:
COUNTY OF NEW YORK  )
```

John E. Durst Jr., being duly sworn, deposes and says:

1.  I am the attorney for the plaintiff, and make his affidavit in opposition to the defendant's motion to preclude expert testimony.

2.  This is a case alleging that a DeWalt model DW 304P reciprocating saw designed and manufactured by the defendant was defectively designed. The complaint alleges that Vitali Mourzakhanov was injured on September 29, 2005 while using a DeWalt reciprocating saw in the manner and for the purpose normally intended. The allegation is that the reciprocating saw was defectively designed, resulting in the injury.

3. Since this motion focuses on the plaintiff's request for an extension of time to exchange expert reports, and the denial thereof on the grounds that no reasons were set forth for the extension, please allow the following explanation as to why the expert's report was not exchanged in accordance with the scheduling order.

4. This explanation was set forth, albeit in summary and conclusory form, in a letter to the Court on February 13, 2008. Exhibit 1. Upon review of the Guidelines for Electronic Filing, it is clear that I incorrectly filed the letter in support of the Proposed Scheduling Order. I submitted the letter via ECF, in accordance with the FAQ instructions for "How to file a proposed order, judgment or stipulation". Those instructions were to submit the proposed order by email to the Clerk. I submitted the proposed order to the Clerk, but submitted the letter to the Court via ECF.

5. I did not get to the "How do I submit a letter" FAQ, which does state to submit a letter in the traditional manner, not through ECF.

6. The Court's memo endorsement denying the letter request was written on the Proposed Scheduling Order, not the letter, and the Memo stated that there was "no reason given." Admittedly the reason submitted in the

letter was not explained and therefore wholly conclusory in nature, but it does not seem to be "no" reason. It is my understanding therefore that it was my failure to follow the correct submission procedure that resulted in the Court not even seeing the reason set forth in my letter in support of the extension. Hopefully in that situation I may be personally sanctioned for failure to know the correct submission procedure, rather than my client being punished by his case being eviscerated as a result of his attorney's unfamiliarity with the ECF procedures.

      7. Since I assume that the Court did not see my statement of a reason set forth in the letter transmitted via ECF, I respectfully beg the forgiveness of the Court for my mistake, and request an opportunity to articulate that reason for the extension at this time.

      8. First allow me to set forth the efforts by the plaintiff to comply with discovery in a timely fashion.

      9. July 3, 2007: the action was removed to the Southern District of New York from Supreme Court, Bronx County.

      10. July 9, 2007: We sent photographs of the saw model and photographs of the injured hand to counsel for the defendant on July 9, 2007 as part of an e-mail attachment. Exhibit 2.

11.     July 11, 2007:  We exchanged automatic disclosure, setting forth all the particulars concerning the medical evidence, with authorizations and copies of records we had in our possession.  We provided employment information as well, but told the defense counsel orally, and confirmed later on the record, that we were not making a claim for lost wages, since the plaintiff was fully paid his salary while out of work by his employer, and had returned to work. Exhibit 3.

12.     On August 24, 2007, plaintiff's counsel sent a video on a DVD to the defendants specifically setting forth and demonstrating the defect alleged to exist in the design of the product.  Attached is a copy of that video, in flash format which the Court should be able to play on its computer. Exhibit 4.

13.     The video sets forth the relevant medical records, and shows diagrams and representations of the portion of the body injured, and the plaintiff sets forth a description of the repercussions of that injury.

14.     In the transmittal letter of August 24, 2007, Exhibit 5, I stated as follows:

> "Frankly, other than some focused
> discovery requests concerning other
> accidents, and a deposition of your
> client, I believe we are essentially
> ready for trial.  The injury is well

defined, specifically, the plaintiff's ulnar nerve, and associated tendons and other structures between the long finger and the ring finger to the palm of the hand, were completely severed and have not regained their functioning.  Furthermore, the plaintiff has a neuroma where that ulnar nerve was severed.  Finally, he has developed carpal tunnel syndrome from the injury.

On liability, the plaintiffs will call Professor Igor Paul as a mechanical engineering expert to testify as to the feasibility and cost of guarding the operators' hand.  The design will increase the safety to the consumer, without impairing the function or increasing the cost of the product.

As far as a scheduling order, please be advised that we are ready now to present the plaintiff for depositions.  I can basically agree to any date you pick; my client is available immediately.  If you need medical records other than those previously provided by us, we will be happy to share records, not just authorizations, with you.  I would want to do the deposition of your client within one week of presenting my client."

15.   The alleged defect was simple:  below is a photograph of the saw:



16.     Next is a photograph of the proposed safer design.  The small addition of a hand guard, to prevent the user's hand from sliding forward and encountering the exposed blade, was the only design change.



17.     September 5, 2007: by e-mail I said to the defense counsel "if there is a particular document that

you don't have that you see on the DVD just drop me a line and I'll send you a PDF version by e-mail." Exhibit 6.

19. 18. The initial consent scheduling order required exchange of expert witness information by January 15, 2008. Depositions of experts were to be completed on or before March 1, 2008, and the pretrial order filed by April 1, 2008. Exhibit 7.

19. October 3, 2007: I sent an e-mail to Mr. Calinoff stating "can we work on scheduling some depositions? Let's get the basics over with... I can produce the plaintiff next week. Just give me a day that's convenient for you. If something turns up later warranting a further deposition of him, so be it." Exhibit 8.

20. Plaintiff and defendants' counsel were cooperating fully and professionally, and there were no disputes.

21. The defendant could not fit in the deposition of the plaintiff until right around the holidays, and at the time the plaintiff had returned to Russia to visit his family for Christmas. We therefore agreed to request an extension of time from the Court, which the Court granted. Exhibit 9.

22. The plaintiff's deposition was held on January 22, 2008. Exhibit 10.

23.     The defendant's deposition was held on February 5, 2008. Exhibit 11.

24.     At that deposition, the deadline for exchange of expert reports was discussed between counsel. We agreed at that time that due to the fact that there was information requested to be produced at the deposition that were basic to an expert's evaluation, we would jointly request an extension of time from the Court of the deadlines for expert discovery.

25.     There were a number of items that were agreed to be produced by the defendant that would take longer than the 10 days before the deadline for expert reports to gather.[1]  I insert the summary of the deposition

---

[1] 1.  During the deposition, it became apparent that a primary, if not sole, explanation for the defendants' design was that there had been very few accidents with the predecessor models, and therefore no motivation to change the design.  Although the model DW 304P had been put on the market about 2004, predecessor models, the DW 304, 303, 305 and 306, had been put on the market "at least 20 years ago".
   2.  The new model upon which the plaintiff was injured differs in that the 304P has a "cage", which contains the blade, enabling the blade to be turned into four different positions, one with teeth down, one teeth out, one teeth sideways left or right.  The predecessor models lacked the turning mechanism.
   3.  While the 304P is substantially different than the models 304, 303, 305 and 306, the witness stated that "the fundamental design of the front end of the tool which is what we're talking about is identical."  Although he said the design of the "cage" was different for the 304P

than the other models, he felt the dimensions were extremely close.  Page 22 lines 3-9.
       4.   He was involved in the safety review of the 304P.  There were minutes taken during the safety review of the 304P which he did not bring to the deposition.  Defendant agreed to produce them.  Page 23 lines 10-25.
       5.   He says that all of the design engineers for the model 304P are retired.  Pages 24-26.  He agreed to produce the names of these retired design engineers.  Page 25 lines 3-22.  (The page numbers referred to are the page numbers at the top right of the PDF document, not the page number at the center bottom.)
       6.   Mr. Mitrou described the safety review process, accentuating "the safety and litigation history of the predecessor of the product under review, and if there is any motivation to make any changes based upon history of the product in the new design or the next iteration of the design".  Page 27 lines 14-25.  When asked if any consideration was given to changing the design of the Mac to provide any further gardening for the blade, the witness replied "there is no doubt in my mind that a discussion about the gardening as well as all the other aspects of the tool took place.  And considering that we had at the time of approximately 2 million of these in the field without any significant issues from a safety standpoint, there would have been little motivation to make any changes."  Pages  28 l. 20 - Page 29 l. 5.
       7.   When asked for specifics about reports of users injuring their hands on the blades of the 304 and 303, the predecessor models, the witness had claims information, but did not have any other information, such as consumer complaints, reports from distributors, telephone complaints.  All he had was a report of cases actually litigated.  Page 29.
       8.   He did say the configuration of the 304P differed from the 304 and 303 in the "bend".  Page 28.
       9.   When asked if any consideration was given to providing some form of guard along the area of the neck to prevent someone's hand from moving forward in the event of a kickback, he replied "at the time the 304P was designed having approximately 2 million of these in service without any significant injury really did not motivate Black & Decker to fix the problem that it didn't have."  Page 35 line 6-10. At the same time, the witness stated that he could not actually recall any conversation about the guarding at that meeting.  Page 35 lines 13-17.  He says if

into the footnote. As in the letter request, I am not sure the Court wishes to spend its time on the nuances of our discovery.

---

there was a question about the adequacy of a guard, it would be meditated, and the design team would review the question and discuss it at the next meeting. On the other top 10, if at the design meeting they just said "you know guys, we had 2 million of these out for the last 10 years and we don't have any safety issues, that comment probably wouldn't have been recorded." Page 36 lines 9-Page 37 lines 6.

   10. He said that Black & Decker would not spend money on changing designs of anything without a motivating force, such as a competitor, marketing or safety factor. Page 37 lines 13-22. He said that changing the design might hurt more than it helps. Page 38.

   11. The witness testified that "we have an electronic database that tracks all formal claims in Black & Decker. We have a one 800 call center that keeps I believed 18 months of data active, that database is checked. The litigation claims database is checked. We get notified by big boxes such as Home Depot and Wal-Mart if there's any customer complaints come in with respect to injuries. And we of course get CPSC reports, Consumer Product Safety Commission reports, that are forwarded to our company if there's any consumer complaints." Page 41 lines to-14.

   12. The witness had with him at the deposition a list of claims that were made. Dep Exhibit 3, claims list. He was asked to produce the name and address of the persons who made those claims, and the date the claims were made, and agreed to do so. Page 42 lines 16-25; page 43 lines 2-8. I called for production of the files concerning these cases. Page 45 lines 23-page 46 line 8.

   13. The witness then stated that the 304, 303, 305 and 306 all differ from the model 304P, in that the model 304P "is in a category of its own as far as the four blade position. All the other ones on that list are effectively the same design with some minor marketing modifications. Clearly from what is at issue here from a motor case forward they are all extremely similar." Page 48 lines 3-9.

26.     Suffice it to say that the witness recapitulated the various things considered in the design review of a new product, on page 48 lines 23 -- page 49 line 17.  Of the items reviewed to make the determination at the safety review, the witness brought only one item, the list of cases actually litigated, to the deposition.

27.     Thus, of the items mentioned by the deponent, page 48 line 23-page 49 line 17, which were considered in the design review, the following information was requested:

> 1. Claims of injury formally presented to the claims department -- *provided*;
>
> 2. Feedback/reports of injury from the service organizations -- *not provided*;
>
> 3. 1-800 telephone call reports of injury -- *not provided*;
>
> 4. Reports of injury to marketing -- *not provided*;
>
> 5. Reports of injury from the Consumer Product Safety Commission -- *not provided*.

28.     Nor has the safety review report or minutes been provided.

29.     Nor has the identity of the design engineers and their last known addresses been provided.

30.     Nor has the information regarding the identified claimant's, or their files, been provided.

31. From page 49 to page 58, we discuss the mechanics of gathering that information, and it basically entails gathering pre-existing computer databases, filtered by keywords we specified at the time of the deposition. The task is not arduous, but it would take time and coordination amongst various corporate individuals and possibly departments. As a gentleman attorney, I do not dispute when a party tells me that it will take some time to accomplish such missions. I know everyone has many daily tasks, and my needs do not always jump to the fore.

32. But the information agreed to be produced has to be provided to the experts, and assimilated into their reports. The defendant expert will be relying on this information as the basis for their opinion that the product did not need a safer design, that our client's accident was a fluke.

33. Once we have the information, we would have to give Dr. Paul, the expert, a reasonable period of time to incorporate it into his evaluation. Experts are not always available at the last minute to accommodate lawyers' time constraints.

34. Therefore we were aware of the need to request the extension.

35. The defendant then requested a further deposition of the plaintiff, because it turned out that the plaintiff had the wrong address for the place of the accident, which he had corrected after his deposition. It was agreed that the further deposition would take place on February 12, 2008.

36. On February 12, 2008, at the second deposition of the plaintiff, the defendant indicated through counsel that the material we had requested had not been gathered, and it was not anticipated that it would be provided in advance of the deadline for exchange of expert reports. Defense counsel and I therefore agreed to submit a request to the Court for an extension of time to exchange expert reports.

37. A letter was drafted during the deposition, with the agreement of the defense counsel. The letter was submitted to the orders and judgment clerk, via ECF. Exhibit 12.

38. That letter stated that important information agreed to be provided during the deposition was being searched for. Not wishing to cast aspersions, I spared the Court the details as to what information was being searched for, and by whom, and who was prejudiced therefrom. Unfortunately, the lack of detail resulted in

the Court writing a Memo denying the request for an extension, on the grounds that no reason was set forth in the request.

39.   I did not know if the Word document that the letter request was seen by the Court, so upon receiving the memo endorsement written on the proposed scheduling order, I called the Court's Clerk, and left a message indicating that there was a letter submitted with the proposed order, and asking if the Court had reviewed that or if it had been lost in cyber filing.  I did not receive a telephone call back.

40.   I contacted Dr. Igor Paul, our expert witness, and eventually received an e-mail back from him to the effect that he and his wife were on a South American cruise until March 20, 2008, and that he was sending his email from 420 miles NNE off Buenos Aires.

41.   I therefore have not received an expert report to date.

42.   Nor have I received the information requested in the deposition to date.

43.   I have not even been transmitted a copy of the plaintiff's second deposition transcript by the defendant.

44.     I did receive an e-mail on March 11, 2008 from Mr. Calinoff counsel for the defendant, indicating that he did have the "claim information and safety review which you requested at the deposition of Ted Mitrou". Exhibit 12.

45.     Note that he mentions "claim information", which as set forth above, if interpreted to mean formal claim information, was already produced at the deposition.  The information we had requested at the deposition was not limited to "claim" information, as set forth above.

46.     Secondly, counsel stated "we wish to produce this material pursuant to a protective order as some of it relates to confidential or proprietary material. Do you have any form of order which you would propose to use or should I draft want?"

47.     I responded that same day to Mr. Calinoff that he would have to justify that the material meets the standard for a protective order a little more before I would agree to it.   Exhibit 12.

48.     He responded that "the safety review itemizes, step-by-step, the process for product safety review and is proprietary."  He offered no further

justification for a protective order regarding the claim information.    Exhibit 12.

49.    Thus, to this date I have not received any of the information requested at the deposition.

50.    Given the fact that the plaintiff's were prepared to complete depositions in a timely fashion, and the defendants' delayed the completion of depositions until just before the time for exchange of expert reports by the plaintiff, it is respectfully submitted that it is inequitable for the defendant's delay to result in preclusion of the plaintiff from having an expert in the case.

51.    Furthermore, to require the plaintiff's expert to prepare a report without the benefit of the complete plaintiff's deposition, transcript of which had not been provided by the defendant and still has not been provided, or to prepare a report without basic discovery of complaint information from the defendants, would be again unfair.  The defendants' delay would work to prejudice the plaintiff.

52.    We provided all information we had without being asked, *within days* of the case being removed to federal Court, and agreed to produce the plaintiff for depositions *on any day convenient to defense counsel.*

Nevertheless those depositions were not completed until *three days before the required exchange of expert information by the plaintiff*.

53.  Furthermore, information which we had identified as being *the sole discovery information we sought in a letter on July 11, 2007*, was not provided prior to the date that this expert exchange was required. Furthermore, it has *not been provided to date*, was not brought to the deposition of the defendant, and the defendant is still attempting to circumscribe that discovery to "claims", implying litigation claims, rather than the full range of sources of information for consumer complaints and accident reports.

54.  I do not know if this is an intentional litigation strategy, done with a smile and a pat on the back.  I do know that this process that did occur, with the motion to preclude the expert, has turned into an effective attempt to dismiss this case, not on the merits, but on some misfeasance by counsel for the plaintiff.

55.  The plaintiff's counsel has not done anything to warrant such punishment from the Court.

56.  The defendant requested an extension of time, which we consented to and which the Court granted. Plaintiff and defendant requested one extension in this

case, not because of delay on plaintiff's part, but because of delay on the defendants' part.

57.   We have been in every instance of this case attempting to propel it to trial.  To in effect dismiss the plaintiff's day in Court by precluding the expert under these circumstances would be an injustice.

58.   It is respectfully submitted that after a review of the explanation herein, the Court reconsider its prior denial of modification of the scheduling order, and grant it.

For these reasons, it is respectfully requested that

1) The Court deny the motion of the defendant to preclude plaintiff's expert;
2) the Court grant an extension of time to exchange expert reports and complete expert depositions, in accordance with the attached proposed scheduling order

THE DURST LAW FIRM, P.C.

_____
By: John E. Durst, Jr. (6544)
Attorneys for Plaintiffs
319 Broadway

                                                        New York, New York 10007
                                                       (212) 964-1000

Sworn to before me this
18th day of March, 2008

_____
    Notary Public