200607.txt

1

1

2

3

4   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
    ----------------------------------------------
5   VITOLI MOURZAKHANOV,

6                        Plaintiff,

7           vs.        No. 07 CV 6205 (LAK)

8   DEWALT INDUSTRIAL TOOL CO., DEWALT
    CONSTRUCTION TOOLS and BLACK AND DECKER
9   (U.S.) INC.,

10                      Defendants.
    ----------------------------------------------
11

12

13

14           DEPOSITION OF TED MITROU

15            New York, New York

16          Tuesday, February 5, 2008

17

18

19

20

21   Reported by:

22   CHRISTINE MORELLA

23   JOB NO. 200607

24

25

2

1

2

200607.txt

3          February 5, 2008

4              10:15 a.m.

5

6          Deposition of TED MITROU, held at

7      the offices of Calinoff & Katz, LLP, 140

8      East 45th Street, 17th Floor, New York,

9      New York, pursuant to Notice, before

10     CHRISTINE MORELLA, a Notary Public of

11     the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    3

1

2      A P P E A R A N C E S:

3

4      THE DURST LAW FIRM, P.C.

5      Attorneys for Plaintiff

6          319 Broadway

7          New York, New York 10007

200607.txt

```
 8          BY:    JOHN E. DURST, JR., ESQ.
 9
10          CALINOFF & KATZ, LLP
11          Attorneys for Defendants
12                 140 East 45th Street, 17th Floor
13                 New York, New York 10017
14          BY:    ROBERT CALINOFF, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

                                                        4

```
 1
 2                 IT IS HEREBY STIPULATED AND AGREED,
 3          by and between counsel for the respective
 4          parties hereto, that the filing, sealing
 5   and certification of the within deposition
 6   shall be and the same are hereby waived;
 7                 IT IS FURTHER STIPULATED AND AGREED
 8          that all objections, except as to the
 9   form of the question, shall be reserved to
10   the time of the trial;
11                 IT IS FURTHER STIPULATED AND AGREED
```

200607.txt

12          that the within deposition may be signed

13          before any Notary Public with the same

14     force and effect as if signed and sworn to

15     before the Court.

16

17

18

19

20

21

22

23

24

25

                                                    5

1

2     T E D   M I T R O U, called as a witness,

3     having been duly sworn by a Notary Public,

4     was examined and testified as follows:

5     EXAMINATION BY

6     MR. DURST:

7          Q.    Please state your name for the

8     record.

9          A.    Ted Mitrou.

10          Q.    What is your business address?

11          A.    701 East Joppa Road, Towson,

12     Maryland 21286.

13          Q.    Who are you employed by?

14          A.    By Black and Decker.

15          Q.    How long have you been employed

16     there?
                          Page 4

200607.txt

```
17          A.    Approximately fifteen years.
18          Q.    What is your current position?
19          A.    Senior safety assurance manager.
20          Q.    What are your responsibilities in
21    that position?
22          A.    My responsibilities include
23    representing the company in any kind of
24    claims and litigation as well as
25    participating in reviewing products safety,
```

6

```
 1                MITROU
 2    reviews that are under development.
 3          Q.    Have you testified before in court?
 4          A.    Yes.
 5          Q.    How many times approximately?
 6          A.    Once.
 7          Q.    Have you prepared reports in cases
 8    that are pending in court before?
 9          A.    Yes.
10          Q.    How many cases approximately?
11          A.    Approximately half dozen.
12          Q.    How long have you been in your
13    current position?
14          A.    It will be five years, going on
15    five years.
16          Q.    Before that what did you do?
17          A.    I worked in development
18    engineering.
19          MR. CALINOFF:  You mean at Black
20          and Decker?
```

200607.txt

21          MR. DURST:  Yes.

22      Q.   Going back chronologically in time,

23  can you tell me what positions you've held at

24  Black and Decker for approximately how long?

25      A.   Yes.  The other position that I've

7

1              MITROU

2  held at Black and Decker was director of

3  reliability engineering.  And the first hand

4  of the fifteen years that I worked for Black

5  and Decker I had that position which was part

6  of the development engineering department.

7      Q.   How large is the development

8  engineering department at this point in time?

9      A.   It's a little hard to answer.  You

10  mean including clerical staff and technical

11  staff, the whole organization?

12      Q.   No, including technical staff, not

13  clerical staff.

14      A.   I would estimate in the order of

15  two to three hundred people.

16      Q.   Where are they located?

17      A.   The majority of them are located at

18  World Headquarters in Towson, Maryland.  We

19  have smaller development teams in Brockville,

20  Canada, in Spinimore (phonetic, England, in

21  Ronosa, Mexico and in China.

22      Q.   Prior to going to work for Black

23  and Decker, can you describe for me the

24  various positions you've held just in

25  summary?

200607.txt

8

```
 1              MITROU
 2        A.   Yes, and if you don't mind I'll
 3    refer to my resume so I get the dates right.
 4        Q.   Sure.
 5        A.   I did bring that with me.
 6        Q.   Could we mark that as an exhibit?
 7        A.   Sure.
 8        Q.   If you don't mind.
 9             MR. CALINOFF:  Mitrou A.
10             MR. DURST:  I guess it would be
11        Plaintiff 1.
12        A.   Okay.  From 1990 to 1993 -- well,
13    first, I'll say that my entire career, if I
14    can generalize, has been in the area of
15    product testing, reliability and safety.  My
16    positions before Black and Decker were from
17    1990 to 1993, I was director of quality
18    assurance for a defense company named Koll
19    Morgen, they made periscopes for the U.S.
20    Navy.
21             From 1988 to 1990, I was director
22    of an electrical engineering lab called
23    Spring Born Laboratories that did independent
24    product analysis.
25             For seven years, 1981 to 1988, I
```

9

```
 1              MITROU
 2    was director of quality assurance for a high
```

200607.txt

3    tech company named Teleco, that made

4    equipment that assisted in off shore oil

5    explanation.

6          In 1975 to '81, I was the quality

7    manager for a power tool company named AEG,

8    which was a German company, making power

9    tools similar to Black and Decker.

10          And my first job out of school from

11    1970 to 1975, as a senior engineer was for

12    Underwriters Laboratories, where I was a

13    safety engineer whose classification was

14    primarily power tools.

15    Q.    Describe your educational

16    background?

17    A.    I have an electrical degree from

18    Marquette University in 1970.

19    Q.    Is that a BS?

20    A.    That's a BS, bachelor of science,

21    yes.  And I also hold a professional

22    engineering license.

23    Q.    Do you have any other educational

24    advance degrees or advance certifications

25    other than professional engineer and the BS

10

1                MITROU

2    degree?

3    A.    It's not on my resume, I had, and I

4    don't even recall now, perhaps twenty or

5    twenty-three credits toward a master's in

6    business administration from the University

7    of New Haven, but when I transferred jobs I

Page 8

200607.txt

8      didn't complete that.  And I'll add, of

9      course, since 1970 to now I've attended

10      numerous seminars in my field.

11          Q.   Are you a member of any

12      organizational bodies, governmental standards

13      or otherwise or have you been in the past?

14          A.   I have represented industry in the

15      power tool area in the PTI, which is power

16      tool institute, with UL, and the IAC, which

17      is the industry advisory counsel.  I was also

18      the director for RAMS, which is a reliability

19      organization, and would participate and give

20      instructional presentations yearly for

21      probably eight or ten years.

22          Q.   In your studies at Marquette, were

23      there any courses on safety engineering given

24      or something of that substance?

25          MR. CALINOFF:  Per se that's the

                                                    11


1                   MITROU

2      course?

3          MR. DURST:  No, not per se but of

4          that substance focusing on safety.

5          A.   No.

6          Q.   Portions of courses did deal with

7      that though?

8          A.   There was -- I can't remember any

9      technical courses educationally that back in

10      1965 to '70 focused on safety.  My initial

11      experience and training in safety was when I

                        Page 9

200607.txt

12    joined Underwriters Laboratories whose entire
13    work field is safety orientated.
14        Q.   Do you recall any courses that you
15    have taken from graduation from school up to
16    the present time, do you recall the names of
17    any such courses or can you describe any such
18    courses?
19        A.   Well, I've taken courses in
20    forensics engineering, I've taken courses in
21    appropriate warning development from the
22    University of Wisconsin, I've taken seminars
23    in reliability engineering as well as given
24    seminars in reliability engineering.  As far
25    as actual names of other courses, I don't

                                                12

 1                    MITROU
 2    recall at this time.
 3        Q.   Can you recall any courses that you
 4    took dealing with, specifically dealing with,
 5    the guarding of mechanical equipment?
 6        A.   I didn't have any educational
 7    courses dealing with the guarding of
 8    equipment.
 9        Q.   At Underwriters Laboratory was
10    there any educational process with regard to
11    guarding of mechanical equipment?
12        A.   Yes, of course.  I worked on all
13    power tools while I was at UL, and started as
14    an apprentice.  And all of the UL standards
15    address guarding and we were required to
16    study and learn all those requirements, and
                              Page 10

200607.txt

17    also work under the direction of a senior

18    engineer at the time who instructed us, and

19    things related to safety not only in guarding

20    but electrical properties, testing and

21    everything else.

22        Q.    With regard to reliability

23    engineering, does that embrace the subject of

24    machine guarding?

25        A.    Well, it does in a sense that any

                                        13

1                    MITROU

2    time there is a part of a product, a guard or

3    another part of a product whose failure could

4    cause a safety incident then its reliability

5    becomes consistent with the requirement for

6    safety.

7        Q.    Have you ever in the past been

8    involved in the actual design of mechanical

9    equipment and including the guarding of

10    mechanical equipment?

11        A.    Well, by trade I'm not a designer,

12    but by trade I've participated in literally

13    hundreds of design reviews in which guarding

14    as well as other aspects of products are

15    discussed, critiqued and evaluated.

16        Q.    Did you do that at Black and

17    Decker?

18        A.    Yes.

19        Q.    Did you have design reviews at

20    Black and Decker?

200607.txt

21      A.   Yes.

22      Q.   Can you describe what that is?

23      A.   Well, the design reviews that I

24   attend are related to the safety aspect of

25   the products.  I do not, in my role, attend

                                            14

1                MITROU

2    the design reviews, every design review that

3    goes on with the development tool.  But from

4    a safety standpoint the process that Black

5    and Decker has is from the concept of a

6    product all the way through production

7    release.  There are a series of safety

8    reviews that are structured and attended by

9    certain required people that assess the

10   safety of the product.

11            (Plaintiff's Exhibit 1, Resume,

12       marked for identification, as of this

13       date.)

14      Q.   Now, sir, did you get an

15   opportunity to review a video that was

16   prepared by The Durst Law Firm in this case?

17      A.   Yes.

18      Q.   When did you review that, how many

19   times?

20      A.   I didn't count them.  I probably

21   looked at it at least twice, the most recent

22   being this past week sometime.

23      Q.   Are you familiar with the product

24   depicted in that videotape?

25      A.   Yes.

                    Page 12

200607.txt

15

```
 1              MITROU
 2        Q.   Would you describe your
 3   familiarity, the basis of your familiarity
 4   with it?
 5        A.   I recognize it as a product made by
 6   Dewalt, it's a reciprocating saw, it's model
 7   409, DW409P reciprocating saw.
 8        Q.   Hence forth I will describe that as
 9   the product, product or the saw or the
10   reciprocating saw.
11        A.   You know what, I think, I'm sorry,
12   I mixed my numbers up, I apologize.  It's the
13   DW304P.
14        Q.   Is that different from the 304K?
15        A.   The K just stands for kit, that it
16   comes in a box.
17        Q.   Now, I will refer to that hence
18   forth as the product.
19        A.   Yes.
20        Q.   Can you describe the design history
21   of that product, when it was designed, what
22   its predecessor model was and when it was
23   first produced?
24             MR. CALINOFF:  Objection to form.
25        You can answer.
```

16

```
 1              MITROU
 2             MR. DURST:  I'll rephrase it.
```

Page 13

200607.txt

3      Q.   When was that model initially put

4   on the market?

5      A.   Approximately 2004.

6      Q.   Did it have a predecessor model

7   that was similar to it upon which it was

8   based?

9      A.   Yes.

10     Q.   What was that model?

11     A.   DW303.

12     Q.   Do you know when that predecessor

13   model was initially put on the market?

14     A.   I don't know when the original

15   design was put on the market at this time.

16   It was at least twenty years ago.

17     Q.   What is the difference between the

18   303 and the 304?

19     A.   The 303 does not have a mechanism

20   on the front end that allows you to put the

21   blade in any position other than the normal

22   cut position.

23     Q.   Describe what the new mechanism can

24   do that the old one couldn't do?

25     A.   The new mechanism will allow you to

                              17

1          MITROU

2   put the blade in any one of four positions

3   down the teeth, facing down, facing up or

4   left or right.

5     Q.   I'm going to show you what has been

6   previously marked Defendant's Exhibit C of

7   1/22/08 for identification.  And ask you does

200607.txt

8    that appear to depict the 304 model?

9         A.   The 304P.

10        Q.   Was there a 304 without a letter?

11        A.   Yes.

12        Q.   When was that product made?

13        A.   The DW, even though this sounds a

14   little illogical we'll blame it on the

15   marketing people, the DW304 to my knowledge

16   was the very first product that used the

17   design without that cage.  In other words,

18   the normal reciprocating design, with the

19   blade in the traditional position for

20   cutting.

21        Q.   In other words, it wouldn't turn

22   left and right?

23        A.   It wouldn't turn left and right;

24   that's correct.

25             Then the DW303 came along, even

                                          18

1                   MITROU

2    though it has a lower number.  And the

3    difference in the 303 and 304 I believe were

4    in the size of the motor and possibly the

5    reciprocating length might have been

6    different, but they were generally the same

7    product.

8              Then when the 304P came out, which

9    was around 2004, the feature for the blade to

10   be placed in one or four positions was added.

11        Q.   Let's go ahead and mark, if you

                      Page 15

200607.txt

12    would, on this Defendant's Exhibit C, if
13    that's all right, with an arrow
14    pointing to --
15              MR. CALINOFF:  Let's do that and
16         then we'll mark it as Plaintiff's 2.
17              MR. DURST:  That sounds confusing.
18              MR. CALINOFF:  Just a copy of that
19         exhibit so it's fine to do that.
20              MR. DURST:  It's going to be a
21         confusing record.  I'm easily confused.
22         Q.   We're going to go ahead and mark it
23    first as Plaintiff's Exhibit 2, which is
24    exactly the same as Defendant's Exhibit C of
25    1/22/08.

                                            19

1                    MITROU
2              (Plaintiff's Exhibit 2, Copy of a
3         Photograph, marked for identification,
4         as of this date.)
5         Q.   Sir, I'm going to ask you have you
6    ever testified either in deposition or trial
7    or otherwise with regard to the 304 the 304P
8    in the past?
9         A.   No, sir.
10         Q.   Have you ever testified with regard
11    to the 303 in the past?
12         A.   No, sir.
13         Q.   Have you ever testified with regard
14    to 304 without the P?
15         A.   No, sir.
16         Q.   Now, if you wouldn't mind just
                        Page 16

200607.txt

```
17    drawing with an arrow and maybe -- what did
18    you call it, the cage, what did you call this
19    part in the front?
20         A.   I referred to it as the cage.
21         Q.   Is that what the K stands for?
22         A.   No.
23         Q.   That's kit.
24              MR. CALINOFF:  John, can we ask him
25         to circle the cage, only because there's
```

                                            20

```
1                   MITROU
2         already an arrow there.
3         Q.   Well, the arrow is not pointing to
4    the cage, is it?
5         A.   No, it's pointing to the neck.
6         Q.   Rather than mark it up do a little
7    arrow pointing to the cage area.
8         A.   That's probably not the name on the
9    parts list but for our discussion.
10        Q.   Perfect.  You've drawn an arrow
11   with the word cage.
12             Is that part removable?
13        A.   No.  Anything is removable.
14        Q.   It's not intended to be removed?
15        A.   It's not intended to be removed.
16   There's no way that the user would ever have
17   any reason to remove that though.
18        Q.   With regard to the neck area, is
19   that the same design of the neck that was in
20   the 303 model?
```

                        Page 17

200607.txt

21        A.    There are approximately 3.5 million

22   tools that we've sold with that neck design.

23        Q.    The difference in all those tools

24   would be -- how many models is that?

25        A.    The ones that I described before

                                                    21

 1                  MITROU

 2   there's also a 305 and a 306, which also the

 3   difference are either in the size of the

 4   motor maybe ten amps versus eight amps or the

 5   stroke length which is an inch an eight or

 6   something else.  But the fundamental design

 7   of the front end of the tool which is what

 8   we're all talking about is identical.

 9        Q.    Do they use a mold or something to

10   make that?

11        A.    It's just been a very reliable and

12   safe design for us all its life.

13        Q.    The 304 without the letter --

14        A.    Yes.

15        Q.    -- when was it first put on the

16   market?

17        A.    At least twenty or twenty-five

18   years ago.

19        Q.    Are the dimensions for the 303 and

20   the 304 necks the same as the 304P?

21        A.    Identical.

22        Q.    With regard to the front portion

23   which you called the cage.

24        A.    Yes.

25        Q.    Does that cage dimension differ in
                          Page 18

200607.txt

22

```
 1              MITROU
 2   the 304 and 303?
 3        A.   I'm not sure.  It's extremely
 4   close, if there is any difference it's by
 5   design different, it looks differently than
 6   that because the nature of the mechanism.
 7   I've never actually compared all the
 8   dimensions but they are certainly very
 9   similar in overall footprint.
10        Q.   Have you reviewed any literature
11   with regard to the design of the 303, 304, or
12   304P and the configuration of the neck, have
13   you reviewed any literature talking about
14   that neck?
15        A.   No, sir.
16        Q.   When was the 303 designed?
17        A.   I don't know.  Sometime, this is
18   not a sarcastic answer, sometime between the
19   304 and 304P it was introduced.
20        Q.   So the design of the neck was first
21   decided upon with the 304?
22        A.   Yes, sir.
23        Q.   Do you know who it was that was
24   involved in the design of the 304?
25        A.   No, sir, I don't.
```

23

```
 1              MITROU
 2        Q.   You had no input on the design of
```

Page 19

                          200607.txt
3    the 304?

4         A.   No, sir.

5         Q.   In fact, the 304, 303 had been

6    designed before you even came to the company,

7    would that be accurate?

8         A.   The 303 and 304 was but not the

9    304P.

10        Q.   When the 304P was designed, did you

11   play any role in the design of that product?

12        A.   Yes, I would be involved in the

13   safety review of that product.

14        Q.   The safety review was that done

15   with any written review material?

16        A.   Typically there are minutes to

17   safety reviews.

18        Q.   Have you looked to see if there

19   were any minutes of safety review of the

20   304P?

21        A.   No, sir.

22             REQ MR. DURST:  I would call for

23        production of any minutes or other

24        written documents with regard to the

25        review of the safety of the 304P and

                                              24

1                   MITROU

2        call for production of that.

3             MR. DURST:  Off the record.

4             (Off-the-record discussion held.)

5        Q.   Now, when you evaluated this did

6    you do it as a team with other individuals

7    evaluating it as well?
                     Page 20

200607.txt

```
 8          A.   Safety reviews are always with a
 9     team, yes, sir.
10          Q.   Who else participates in that?
11          A.   I don't remember the names of the
12     people, but typically the people that
13     participate are people from our safety
14     compliance organization such as the UL
15     representative within the company, the design
16     engineer, the marketing person, a person from
17     litigation, in other words, from my
18     department, the program manager which is the
19     overall person that's managing the program,
20     so there's at a minimum that body of people.
21          Q.   Who was the design engineer for the
22     304P?
23          A.   I'm not sure.  I did ask that
24     question though and was given two or three
25     possible names, all of which are retired at
```

                                              25

```
 1                    MITROU
 2     this point in time.
 3          Q.   Well, can you tell me what those
 4     two or three possible names were?
 5          A.   I can.  I can tell you one was Bill
 6     Sauwerine.
 7          Q.   How do you spell that?
 8          A.   I'm not sure, S-A-U-W-E-R-I-N-E,
 9     that's a little bit of a guess.  I don't
10     recall the other two.  I can provide that for
11     you but I just don't recall the other two.
```

                         Page 21

200607.txt

12        Q.   I would ask then if we can leave a

13    space in the record, maybe three spaces, for

14    the names of the individuals, if you wouldn't

15    mind filling those in.

16        A.   _____

17    _____

18    _____.

19    I don't mind.  Again, the information that

20    I'm giving you is secondhand, it was to the

21    best of the knowledge of the engineering

22    people that I talked to.

23        Q.   If you could look at the minutes,

24    would that clarify the question?

25        A.   It certainly would help, yes, it

                                          26


 1              MITROU

 2    certainly would help.

 3        Q.   If you clarify it by looking at the

 4    minutes first then just fill in the one name,

 5    the actual person's name.

 6        A.   _____.

 7        Q.   REQ I'd also call for the last

 8    known address of that individual, I suppose

 9    you have it in retirement records and so I

10    would like to know what his current home

11    address is.  All right.  I would ask that

12    probably in writing.  Leave spaces for an

13    address.

14        A.   _____.

15        Q.   Is the person from UL compliance

16    still with your company?

Page 22

200607.txt

17          A.    I don't recall who the person back
18     in 2004 was that would have been representing
19     this, so I really can't answer that.
20          Q.    You were the individual from your
21     department that actually did the review or
22     did you have someone else?
23          A.    At the time I was director of
24     reliability engineering, I was in that role
25     not my litigation role.  And either I

                                                  27

1                    MITROU
2      attended the safety reviews personally or if
3      I was in conflict or something I had a group
4      of reliability engineers that would also
5      attend them.  So whether or not I attended
6      every safety review of the 304P I would
7      actually have to look back and see myself.
8          Q.    Do you recall the process though of
9      actually reviewing this product?
10         A.    Oh, yes, that's well built into the
11     Black and Decker development process.
12         Q.    Describe what the safety review
13     entailed?
14         A.    The safety review entails a
15     discussion of the overall design, soliciting
16     input from the backgrounds, the diversified
17     backgrounds of the people that are there,
18     typically the safety and litigation history
19     of the predecessor of the product under
20     review is reviewed, and if there is any

                    Page 23

200607.txt

21    motivation to make any changes based upon

22    history of the product in the new design or

23    the next iteration of the design those would

24    be discussed and the merits would be

25    evaluated, and within Black and Decker a

28

1                      MITROU

2    project cannot move forward through

3    development and released without the safety

4    team giving its approval.

5         Q.   Are there any outside consultants

6    who are asked to review with regard to this

7    particular product?

8         A.   Outside of Black and Decker you

9    mean?

10        Q.   Yes, sir.

11        A.   Typically not.  For this tool

12   highly likely there was not because we have a

13   long history of background and experience

14   within Black and Decker.

15        Q.   Now, do you recall whether any

16   consideration was given to changing the

17   design of the neck for the purpose of

18   providing any more of a guarding quality for

19   the blade?

20        A.   I don't recall a specific

21   discussion involving that.  However, there is

22   no doubt in my mind that a discussion about

23   the guarding as well as all the other aspects

24   of the tool took place.  And considering that

25   we had at the time approximately two million

200607.txt

29

```
 1              MITROU
 2    of these in the field without any significant
 3    issues from a safety standpoint, there would
 4    have been little motivation to make any
 5    changes.
 6         Q.   Had you ever received any reports
 7    of any users injuring their hands on the
 8    blades of the 304 and 303?
 9         A.   I can't pinpoint that answer as of
10    2004.  I can describe to you in hindsight
11    claims that took place with the product, but
12    I can't recall from a specific meeting in
13    2004 a discussion or event took place, but
14    that is a routine discussion that takes place
15    in every safety review.
16         Q.   Do you know if there were any
17    reports of individual users having their hand
18    cut from the blade of the 303 or the 304,
19    whether it resulted in a lawsuit or a claim
20    or not but reports of such things?
21         A.   The only -- not looking at claims
22    history which is clearly identifiable, the
23    primary issue that occurred, although very
24    infrequently, was more often people getting
25    their finger pinched in the reciprocating
```

30

```
 1              MITROU
 2    mechanism rather than being cut from the
```

Page 25

```
                            200607.txt
 3   blade.
 4        Q.   Well, when you say the
 5   reciprocating neck, what portion of the tool
 6   are you referring to?
 7        A.   The blade clamp area which is
 8   inside this.  Keep in mind that prior designs
 9   did not have this entire covering on here,
10   and there is a reciprocating mechanism that
11   the blade is attached to.  And people would
12   have a tendency to misuse the product, and
13   sometimes a finger would go in this area
14   here, I'm pointing to an area that is in the
15   area of reciprocating mechanism, and they
16   would end up having it pinched as the blade
17   clamp went backwards.
18        Q.   You mean when they were trying to
19   change the blade?
20        A.   No, when they were -- plumbers
21   would sometimes hold a pipe with their left
22   hand and actually guide with their thumb the
23   saw with their left hand thumb and hold it
24   back here, and sometimes their thumb would
25   actually slip into the side of the saw.

                                                31

 1                MITROU
 2   Obviously, that's not how the saw is designed
 3   to be used, but people don't always grasp
 4   these the way they are intended to be
 5   grasped.
 6        Q.   How are they intended to be
 7   grasped?
                        Page 26
```

200607.txt

```
 8          A.    The product is intended to be
 9     grasped around the neck area.
10          Q.    Is the palm of the hand supposed to
11     be on the top or the bottom or either of the
12     neck?
13               MR. CALINOFF:  Objection to form.
14               MR. DURST:  I'll rephrase it.
15          Q.    Does it matter whether they use the
16     palm of their hand, assuming they are holding
17     it with the left hand, does it matter whether
18     they put the palm of their hand on the bottom
19     of the neck or on the top of the neck or I
20     guess it depends on what they are doing,
21     right?
22          A.    These saws are used in every
23     orientation and sometimes multiple
24     orientations during the same cut.  And it's
25     most important to maintain control of the saw
```

                                              32

```
 1               MITROU
 2     by wrapping your hand around the neck.  Now,
 3     your hand can wrap it around the neck with it
 4     in any orientation.
 5          Q.    The 303 and 304 when you look at
 6     this cage, is it possible for you to below
 7     here on the white portion of this draw a
 8     depiction, it doesn't have to be accurate,
 9     but a depiction of the configuration before
10     the 304P, just to give us an idea of what it
11     looked like?
```

                          Page 27

200607.txt
```
12          A.    Well, yes, I can.   There
13    historically are two versions of this area,
14    and one would have a similar piece like this,
15    and this is the front of the tool, where this
16    is basically, I'll bring the blade out like
17    this, these are the teeth on the blade, where
18    this is in an open area.
19          Q.    Indicating the cage area?
20          A.    Indicating the cage area.  Let's
21    say that's the clamp on the blade and this is
22    the reciprocating mechanism, and this is the
23    shoe, if you will, that you press against the
24    work as you're using the product.  And
25    because we had, even though it was relatively
```
33

```
1                     MITROU
2    few and minor, people who end up getting
3    pinched in here --
4          Q.    Just go ahead and put a P with an
5    arrow towards the area that you're referring
6    to.
7          A.    Pinched here.  Then subsequent
8    models of the product actually closed up this
9    entire area here, maybe I'll draw another one
10    and I don't say that drawing is my forte,
11    where now this area was actually closed up
12    with metal, so that it would mitigate the
13    likelihood of someone incidentally slipping
14    their finger and getting it pinched.
15          MR. CALINOFF:  John, I didn't
16        object at the time of the question
```
Page 28

200607.txt

```
17          because I thought perhaps it would be
18          answered here.  Is your question was
19          there a different size and shape, it
20          assumed that it was different other than
21          the configuration.  We can go off the
22          record and I can ask the witness to
23          leave the room if you'd like me to.
24               MR. DURST:  No.
25               MR. CALINOFF: Off the record.
```

                                                    34

```
 1               MITROU
 2          (Off-the-record discussion held.)
 3      Q.    The dimensions of the cage areas
 4  for both the 303 which I assume is the
 5  drawing that says closed, and the 304 which
 6  is the drawing that says pinched, the
 7  dimensions of this cage area remained
 8  approximately the same?
 9      A.    That's correct; yes.
10      Q.    The configuration was approximately
11  the same?
12      A.    Yes, sir.  I also want to make it
13  clear that there could be a bend of 303s and
14  304s some of which might have been closed,
15  some might have been opened, and I don't know
16  when that transition took place.
17      Q.    When you received reports of
18  individuals having their fingers pinched, was
19  that when the blade was moving or when the
20  blade was stopped?
```

200607.txt

21        A.   It would have to be moving.

22        Q.   Now, during the design review do

23   you know if any consideration was given to

24   providing some form of a guard along the area

25   of the neck, the end of the neck by the cage

                                                      35

 1                   MITROU

 2   extending downwards, to prevent someone's

 3   hand from moving forward and contacting the

 4   blade in the event of a kickback?

 5        MR. CALINOFF:  Objection to form.

 6        A.   At the time the 304P was designed

 7   having approximately two million of these in

 8   service without any significant injury really

 9   did not motivate Black and Decker to fix the

10   problem that it didn't have.

11        Q.   Was any consideration given to that

12   possible design though?

13        A.   Again, I will say that as a normal

14   course of any safety review all guarding is

15   reviewed.  If I can recall an actual

16   conversation of this meeting some eight years

17   ago, I can't say that I do sitting here.

18        Q.   If such a possible design change

19   was considered, would that be something that

20   would have typically been recorded in the

21   minutes of the design review?

22        A.   Can you restate that somehow?

23        MR. DURST:  Can you read that back.

24        (Record read.)

25        A.   Well, if I can refer to the safety

200607.txt

36

```
1                    MITROU
2    review because the safety review and the
3    design review are two distinct meetings.
4    Which --
5          Q.    I amend my question accordingly.
6          A.    So your question refers to the
7    safety review?
8          Q.    Correct.
9          A.    In a safety review in a discussion
10   of a guard like this the question would be
11   asked by someone like myself or another
12   individual is the guarding adequate.  If
13   there was a question in that safety review
14   about the adequacy of a guard or any other
15   safety feature, it would be minuted, put in
16   the minutes, for an action by the safety
17   review at the next meeting.  And at the next
18   meeting the design team would have come back
19   and said, okay, there was a concern about
20   this area, here's our proposal, here's our
21   three proposals, we have adopted this one,
22   the safety review would say that's acceptable
23   and it would be signed off and we would go
24   forward.
25                    If we had the discussion at the
```

37

```
1                    MITROU
2    304P meeting and everyone looked at this and
```

200607.txt

3    said, well, you know guys, we had two million

4    of these out for the last ten years and we

5    don't have any safety issues, that comment

6    probably wouldn't have been recorded.

7        Q.    Absent of motivation such as a

8    reported injury or a claim --

9        A.    Yes.

10       Q.    -- is it common to retain a design

11   where guarding might be otherwise considered?

12            MR. CALINOFF:  Objection to form.

13       A.    I don't think that Black and Decker

14   would spend money on changing designs of

15   really anything unless there was a motivating

16   force, whether a competitive factor, a

17   marketing factor, certainly a safety factor.

18   You know, there's a saying, if it ain't broke

19   don't fix it.  And when we're comfortable

20   that we have adequate guarding especially on

21   a product, sometimes changing it can hurt you

22   rather than help you.

23       Q.    Do you know if there were any

24   possible hurts as you mentioned that were

25   considered with regard to changing the design

                                              38


1                   MITROU

2    of the neck?  Can you make any sense of that?

3            MR. CALINOFF:  I didn't get that

4        question.  I'm sorry, could you read it

5        back.  The word was hurts?

6            MR. DURST:  I'm just carrying on

7        his terminology the word hurts.

                    Page 32

200607.txt

```
 8          A.   The context in which I said it can
 9     hurt you more than help you, when I said it I
10     was thinking of you might change the guard or
11     some part of the tool and create more of a
12     safety issue than you had when you didn't
13     have one before that you didn't see or didn't
14     foresee or perhaps it caused somebody to try
15     to use or grasp a tool in a way that he
16     wouldn't have had you stuck with an original
17     guard.  So the answer to your question is,
18     no, although I don't really remember your
19     question now.
20          Q.   Let me ask you a question.  With
21     regard to reciprocating saws, other
22     manufacturers make them as well?
23          A.   Yes.
24          Q.   What are the names of the other
25     manufacturers that you know that make a
```

                                        39

```
 1                    MITROU
 2     similar reciprocating saw?
 3               MR. CALINOFF:  Similar, what do you
 4          mean?
 5               MR. DURST:  Well, similar in
 6          purpose.
 7          A.   Well, I think the most recognizable
 8     name in this particular market segment is the
 9     Milwaukee Sawzall.
10          Q.   Are there any other manufacturers
11     as well?
```

200607.txt

12        A.   Yes, there's Porter Cable makes a

13   product also.

14        Q.   Anybody else that you can think of?

15        A.   I think those are the big players,

16   I'm not sure who else might also be making

17   them for the professional market any way.

18   Those are pretty much the big players in the

19   professional market.

20        Q.   With evaluating the design and the

21   safety review, do you take into consideration

22   what other manufacturers might be doing with

23   regard to their saws and the guarding of

24   their saws?

25        A.   Yes.

                                          40


1               MITROU

2        Q.   Do you know if any review was given

3    of the Milwaukee saws or the Porter Cable

4    reciprocating saw?

5        A.   I don't recall, as I've said,

6    before the specific meeting back which would

7    probably be in 2002 or 2003 when this was

8    being developed, I don't recall the

9    discussion and those particular meetings.

10   But I can say that as a matter of practice at

11   Black and Decker we look at all the features

12   both marketing, safety, etc., of competitive

13   products during our design development

14   process.

15        Q.   What effort does Black and Decker

16   make to find out if there have been any

200607.txt

17      reports of injuries regarding power equipment

18      such as the 303, 304 and 304P?

19              MR. CALINOFF:  Objection to form.

20          I'm not sure what you mean by that,

21          John.

22          Q.    What efforts, checking literature,

23      checking consumer products safety reports or

24      whatever is done to review whether or not

25      there have been injuries?

                                                    41

1                       MITROU

2           A.    Well, we have an electronic

3       database that tracks all formal claims in

4       Black and Decker.  We have a one eight

5       hundred call center that keeps I believe

6       eighteen months of data active, that database

7       is checked.  The litigation claims database

8       is checked.  We get notified by big boxes

9       such as Home Depot and Wal-Mart if there's

10      any customer complaints that come in with

11      respect to injuries.  And we of course get

12      CPSC reports, consumer product safety

13      commission reports, that are forwarded to our

14      company if there's any consumer complaints.

15          Q.    Now, do you know if there were any

16      claims received regarding the 303, 304 or

17      304P other than pinching that you

18      described --

19          A.    Hmm-hmm.

20          Q.    -- with regard to lacerations to

                        Page 35

200607.txt

21   the hand or fingers from the reciprocating

22   saws?

23       A.   On the 304, and I don't have the

24   date, but by the file number this goes back a

25   long time, the allegation in our database for

            42

1          MITROU

2   a person named Moore, M-O-O-R-E, alleged that

3   he cut his finger, the disposition of that

4   claim is that the statute expired and it was

5   not pursued.

6         There was another case or, excuse

7   me, claim by a gentleman named Weller,

8   W-E-L-L-E-R, where the alleged injury was the

9   hand contacted blade, that was settled for

10   three hundred twenty-three dollars.  Those

11   are the only allegations that fit your

12   criteria of a possible cut.

13       Q.   Those were for the 304?

14       A.   Both of those that I just mentioned

15   was for the 304, yes, sir.

16       Q.   Do you retain in your database the

17   name and address of the persons who make

18   these claims?

19       A.   I believe we do.  I'm not exactly

20   sure how far our electronic database goes

21   back, so I would have to check to see if that

22   information was in these.

23       Q.   When were these claims made?

24       A.   I did not write the dates down, I

25   can provide those for you.

200607.txt

43

1                    MITROU
2        Q.   REQ well, what we need is the date
3    of the claim, name and address and telephone
4    number of the person making the claim, and
5    any writing or recording, whether tape
6    recording or written notation, of any claim
7    made, what the person said.
8        A.   Sure.
9        Q.   REQ we're going to need that with
10   regard to Moore and with regard to Weller,
11   okay.
12       A.   Sure.
13       Q.   Now, with regard to Weller, was
14   there a legal claim, a formal legal claim,
15   filed by Moore like a complaint?
16           MR. CALINOFF:  The response was
17       that the statute of limitations expired?
18       A.   The statute expired on Moore,
19   right.
20       Q.   So was a claim then filed and then
21   dismissed?
22       A.   A claim was filed to our department
23   and it was settled for three hundred
24   twenty-three dollars.
25       Q.   That was Weller?

44

1                    MITROU
2        A.   Yes, sir.

Page 37

200607.txt

```
 3        Q.    But Moore?
 4        A.    In Moore the claim was filed, it
 5   was denied, it was not pursued by the
 6   claimant, the statute expired.
 7        Q.    Now, you're referring to refresh
 8   your recollection or to refer to a document
 9   which is, I guess, a printout from your
10   database regarding claims?
11        A.    Yes, sir.
12             MR. DURST:  Can we mark that?
13             MR. CALINOFF:  I'd like to see it.
14        I have no problem.  I'd like to redact
15        the information regarding other claims
16        that don't relate to lacerations.  I can
17        have somebody make a copy of it and
18        redact it right now if you want, John.
19             MR. DURST:  But I don't really want
20        to do that.  Because it's relevant to me
21        if claims were made with regard to the
22        pinching area as well.
23             MR. CALINOFF:  Why is that?
24             MR. DURST:  I don't see a
25        distinction between coming into contact
```

                                                  45

```
 1                  MITROU
 2        with the blade while it's moving in
 3        front of the cage or at the cage, it's
 4        still beyond the neck.
 5             MR. CALINOFF:  I'll allow it to be
 6        marked.
 7             MR. DURST:  Over your objection, I
```

200607.txt

```
 8        understand.
 9             (Plaintiff's Exhibit 3, Claims
10        List, marked for identification, as of
11        this date.)
12        Q.   With regard to the pinching claims
13   that were made, that pinching occurred while
14   the blade was in motion, correct, just to
15   refresh --
16        A.   Yes.
17        Q.   Any indication what the users were
18   trying to do that resulted in their fingers
19   coming into that area?
20        A.   Not that I specifically recall
21   without reviewing all the cases, if they are
22   available.
23        Q.   REQ this list indicates a file
24   number, and what I'm going to call for is a
25   copy of each of these files with regard to
```

                                              46

```
 1                  MITROU
 2   anything provided to your company and any
 3   responses that you made to the claimant.  And
 4   I will be happy to pay for the copying of
 5   these files.  If they are electronic format,
 6   I'll take them in electronic format if you
 7   scan your files in.  But I'm going to want to
 8   look at these files.
 9             MR. CALINOFF:  John, just for the
10        record, my experience in representing
11        the company the fact that there's case
```

Page 39

200607.txt

```
12          information available in the database
13          doesn't mean that the file still
14          physically exists.  There's a document
15          retention program, and some of those
16          documents, depending on age, may still
17          physically exist, others may not.
18               Is that a fair statement.
19               THE WITNESS:  Yes, that's actually
20          true.
21          Q.   What is your document retention
22     procedure in the claims department?
23          A.   Well, it's a bit of a complicated
24     one that I can't dictate to you, it depends
25     on the nature of the claim, the settlement
```

47

```
 1               MITROU
 2     costs, what are the statutes that run.  It is
 3     documented, I just can't -- if I said it was
 4     five years and there's an exception that's
 5     seven years, some are three years.  Mr.
 6     Calinoff is correct.
 7               If you look at those numbers and
 8     you see numbers that are in the threes
 9     thirty-two's, the thirty-nine, etc., those
10     are extremely old cases.  I don't know what
11     the highest number there is, but they are
12     basically numerical and they represent that
13     chronologically.  So the numbers that have
14     the high forties numbers are the most recent,
15     the low thirties numbers they could be twenty
16     years old, they could be fifteen years old, I
```

200607.txt

17    just don't know.  The dates are available, I
18    just did not put them down.
19        Q.   Are the 304 and 303 still on the
20    market?
21        A.   I'm not sure.
22        Q.   How about the 305 and the 306, are
23    they on the market?
24        A.   I don't believe so.
25        Q.   What was the difference between

                                            48

1                  MITROU
2    them and the 304P?
3        A.   Well, the 304P is in a category of
4    its own as far as the four blade position.
5    All the other ones on that list are
6    effectively the same design with some minor
7    marketing modifications.  Clearly from what
8    is at issue here from a motor case forward
9    they are all extremely similar.
10        Q.   Same neck basically?
11        A.   Yes.
12        Q.   Is there anything that we haven't
13    discussed that you take into consideration at
14    the safety review of a product such as the
15    304P?
16            MR. CALINOFF:  Objection to form.
17    You can answer.
18        A.   Very broad question.
19        Q.   Can you think of anything that we
20    have not discussed so far that you take into

                        Page 41

200607.txt

21    consideration at the safety review?

22              MR. CALINOFF:  Same objection.

23        A.    Well, we've discussed the input

24    from the claims department with respect to

25    potential, not potential, but previous

49

1                        MITROU

2    injuries; we discussed feedback from the

3    service organizations; the one eight hundred

4    numbers; we discussed information that might

5    come from a CPSC; anytime our marketing folks

6    hear of course of any kind of dissatisfied

7    customer that is brought forward in these

8    meetings; very, very heavily dependent upon

9    is the history and experience of the people

10   in the review, we always assure that we have

11   senior people that participate in those

12   reviews; and certainly from a safety

13   standpoint the history of the predecessor of

14   the product that's either being modified or

15   redesigned weighs heavily in the review.

16   That's what I can think of now, perhaps

17   there's a few other things.

18        Q.    With regard to the one eight

19   hundred reports, have you undertaken any kind

20   of search to determine if there were any one

21   eight hundred reports of injuries involving

22   the 303, 304, 304P, 305 or 306?

23        A.    I have not done that actively.

24   However, there are standing orders with that

25   organization that whenever there's any type

200607.txt

50

1                    MITROU
2    of call that involves shock, injury, fire, I
3    mean any of those kinds of things they
4    immediately forward it to us, and I have no
5    recollection of receiving any of those in
6    recent memory.
7              MR. CALINOFF:  If it was reported
8         would it find its way to Exhibit B?
9              THE WITNESS:  No, that's on a
10        different database, it would not
11        automatically show up on that.
12        Q.   Exhibit 3 is formal claims?
13        A.   It's a formal claims summary.
14        Q.   It's not just reported incidents?
15        A.   No, those are formal -- those are
16   claims that are formally submitted, not a
17   random phone call that somebody calls up and
18   says, you know --
19        Q.   Well, with regard to the phone
20   calls, what record is kept of those?
21        A.   They are kept electronically for
22   eighteen months.
23        Q.   Where are they kept, in Maryland?
24        A.   On a computer.
25        Q.   In Maryland I mean, India?

51

1                    MITROU
2        A.   I believe our one eight hundred

200607.txt

3      center is still in Maryland, things have

4      switched around a little bit recently as we

5      acquired some companies, but I believe that

6      it's still in Maryland.

7           Q.   Well, if you were to do a search on

8      these products, 303 through 306, for any

9      calls regarding those items, have you ever

10     done that kind of thing before, done that

11     kind of search?

12          A.   On these particular tools?

13          Q.   No, on any tools.

14          A.   Oh, of course.

15          Q.   What is entailed, just searching a

16     particular field on the computer?

17          A.   We would either call or e-mail the

18     one eight hundred group and we would say one

19     of two things, more often if we're calling

20     them to get information, more often than not,

21     we will say give us a full dump of everything

22     you have which basically is eighteen months.

23     If something is very specific, let's say for

24     argument sake say something not incriminating

25     like a Black and Decker logo was falling off

52

1               MITROU

2      the tool, how's that for not being

3      incriminating, then we can say do a search on

4      the word logo, and they would pick up all

5      those records.  So we can do any kind of

6      multiple search that might fit a search

7      criteria.

200607.txt

8       Q.   REQ what I'm going to ask for here
9    is a full dump as you referred to it with
10   regard to the 303, 304, 304P and 305 and 306.
11   That's something that could be done just by
12   telling them to type in those numbers and it
13   would search all those fields and print out
14   exactly what they have with regard to those,
15   right?
16       A.   Yes, sir.
17       Q.   REQ I'm going to ask, if it's
18   possible, this is the benefit of computers
19   and this is why we have them, is to make that
20   not a very onerous task.
21           MR. CALINOFF:  John, I'm going to
22           take that under advisement.  If you want
23           to limit it, there are going to be
24           perhaps electrical claims that have
25           nothing to do with this case.

                                                 53

1                MITROU
2        A.    There's requests for parts, there's
3    everything from I lost my instruction manual
4    to how do you turn the tool on.
5            MR. CALINOFF:  It is onerous
6            insofar as myself, people in the legal
7            department at Black and Decker, if there
8            are a lot of these where people are
9            asking for a new box, new cardboard box,
10           the latch on the plastic case broke,
11           hardly relevant here.  Especially in
                        Page 45

200607.txt

```
12              view of the fact that the computer can
13              make a specific search, you know what
14              you're looking for.
15          Q.   How about this then, would we be
16     able to narrow it down to injuries?
17          A.   We could do a search that would --
18     if you give us the keywords you would like to
19     have of interest such as injury, guard, cut,
20     laceration, those are the kinds of words,
21     then it certainly is a reasonable thing to
22     request here.
23          Q.   REQ how about this, I'm going to
24     try to do this right now and you tell me if
25     this works.  How about if we do 303 or 304 or
```

54

```
 1                    MITROU
 2     305 or 306 (injury or cut or laceration or
 3     pinch.)
 4          A.   I think clearly and honestly that
 5     would flush out what you're looking to see.
 6          Q.   It would get rid of the extraneous
 7     stuff you think?
 8          A.   Yes.  Not to play games with what
 9     you said but I'm sure you want to include the
10     304P.
11          Q.   Correct, exactly.  That wouldn't be
12     too onerous, would it?
13          A.   We'll take it under advisement with
14     counsel, but I think that's a more reasonable
15     request.
16          Q.   You'd want to know that as well,
```

200607.txt

17    right?

18              Then you have the big company

19    reports, the retailer reports, right, you

20    mentioned Wal-Mart or Home Depot?

21         A.   I never said we get reports from

22    them.  What I said was if they have a

23    specific customer complaint that they feel

24    the need to pass along to us that's another

25    source of information that we obviously would

                                                    55

1                   MITROU

2     absorb in due course of business.  There's

3     not a monthly report or weekly report or

4     anything like that, no.

5          Q.   Where would those kinds of reports

6     be received?

7          A.   Well, they could come in through a

8     couple of different channels to be honest

9     about it.  They could come in through a

10    marketing in sales organization, they could

11    come directly to our litigation department.

12    I mean ultimately, ultimately, they would end

13    up one way or the other in our hands.

14         Q.   But they wouldn't be recorded as

15    part of the claims database?

16         A.   No, sir.

17         Q.   Is there some kind of a database

18    you keep with regard to those reports?

19         A.   I don't believe there's any

20    electronic filing of those.

                    Page 47

200607.txt
```
21          Q.   Might they be kept in a paper file?
22          A.   I don't know, I honestly don't
23     know.
24          Q.   REQ well, with regard to the same
25     search criteria, if you could use that search
```

56

```
 1                   MITROU
 2     criteria to determine any reports, oral or
 3     written, that were received from retailers or
 4     wholesalers or distributors, I would
 5     appreciate that.
 6               Now, with regard to the consumer
 7     product safety commission.  Has there been
 8     any reports you've received, forwarded or
 9     originating with the consumer product safety
10     commission with regard to those five models?
11          A.   Not to my recollection.
12          Q.   Is that something that would be
13     kept separate from the claims database?
14          A.   Yes.
15          Q.   Is there some type of a database
16     where that would be kept?
17          A.   I believe that copies of those,
18     formal copies of those, are kept either in
19     our department or by Miles & Stockbridge.  So
20     I believe those aren't kept electronically
21     but they are tracked through our legal
22     department.
23               REQ MR. DURST:  I would ask for any
24          inquiries or reports or writings with
25          regard to those five models that were
```
Page 48

200607.txt

57

```
 1                    MITROU
 2          originated or received from the consumer
 3          product safety commission.
 4               REQ and then you mentioned
 5          marketing might also submit something, I
 6          would also ask the same request with
 7          regard to any documents or inquiries or
 8          reports received from any of the
 9          marketing agents.  Okay.
10          Q.   Is that all right?
11          A.   It's all right.
12          Q.   Subject to your counsel --
13          A.   Subjects to my counsel's approval.
14               MR. CALINOFF:  We'll take it all
15          under advisement.
16          Q.   It's basically just a request that
17     goes out to a particular -- first you have to
18     identify the particular person who would
19     maintain those records, right, and then a
20     request to them to gather the records?
21          A.   I understand.
22          Q.   Is that correct?
23          A.   I understand.
24          Q.   Depending on their filing skills it
25     would be doable, depending on their filing
```

58

```
 1                    MITROU
 2     skills.
```

200607.txt

3          MR. DURST:  I have no further

4      questions.  I appreciate your patience.

5          (Time noted:  11:45 a.m.)

6                  _____

7                      TED MITROU

8

9      Subscribed and sworn to before me

10     this ___ day of _____, 2008.

11

12     _____

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        59

1                  MITROU

2            C E R T I F I C A T E

3      STATE OF NEW YORK    )

4                          : ss.

5      COUNTY OF QUEENS     )

6

7            I, CHRISTINE MORELLA, a Notary
                  Page 50

200607.txt

```
 8          Public within and for the State of New
 9          York, do hereby certify:
10               That TED MITROU, the witness whose
11          deposition is hereinbefore set forth,
12          was duly sworn by me and that such
13          deposition is a true record of the
14          testimony given by the witness.
15               I further certify that I am not
16          related to any of the parties to this
17          action by blood or marriage, and that I
18          am in no way interested in the outcome
19          of this matter.
20               IN WITNESS WHEREOF, I have hereunto
21          set my hand this 11th day of February,
22          2008.
23
24               _____
25                    CHRISTINE MORELLA
```

                                        60

```
 1                    MITROU
 2     -------------------- I N D E X
 3     -------------------
 4
 5     WITNESS          EXAMINATION BY          PAGE
 6     TED MITROU       MR. CALINOFF
 7     -------------- INFORMATION REQUESTS
 8     --------------
 9
10     TO BE FURNISHED:          Page    Line
11                                25      16
```

Page 51

```
                              200607.txt
12                                  26      6

13                                  36      14

14      REQUESTS:                  Page    Line

15                                  23      22

16                                  26      7

17                                  43      2

18                                  43      9

19                                  45      23

20                                  52      8

21                                  52      17

22                                  53      23

23                                  55      24

24                                  56      23

25                                  57      4


                                              61


 1                      MITROU

 2

 3      ---------------------- EXHIBITS

 4      --------------------

 5

 6      PLAINTIFF'S                    FOR ID.

 7      1       Resume                      14

 8      2       Copy of a Photograph        19

 9      3       Claims List                 45

10

11

12

13

14

15

16                      Page 52
```

200607.txt

17
18
19
20
21
22
23
24
25